The Wabash Railway Company v. Savage.

Filed March 17, 1887.

———◆———

No. 11,127.

THE WABASH RAILWAY COMPANY v. SAVAGE.

RAILROAD.—*Master and Servant.—Line of Duty.—Ejecting Passenger from Train.—Complaint for Injury.*—An averment in a complaint against a railroad company for an injury sustained in being ejected from a train, that the injury was inflicted by the "defendant, acting through its agents and servants," is equivalent to an averment that the defendant acted through its *duly authorized* agents and servants, and is sufficient to present the question at the trial as to whether the persons who performed the acts charged were the agents and servants of the defendant, and acting at the time within the line of duty.

SAME.— *Wilful Injury.— When Complaint Sufficiently Specific.*—A complaint against a railroad company, alleging that the plaintiff was admitted as a passenger into a train, and that he was wilfully and maliciously ejected therefrom by the defendant, acting through its agents and servants, while it was in motion, whereby he was injured, is sufficiently specific, without describing the kind of train, the particular servant or agent, or the time of day the train left the station where the plaintiff took passage.

The Wabash Railway Company v. Savage.

SAME.—*Brakeman.—Authority to Eject Passenger.—Liability of Company for Wanton Injury.*—A brakeman, in the absence of express orders, has no authority to eject a passenger from a train, yet a railroad company is liable for an injury wantonly inflicted by him on a passenger travelling on a train on which he is acting.

SAME.—*Damages.—Evidence as to Effects of Injury.*—In an action for a personal injury, an averment that the plaintiff had "become wholly crippled and maimed, and prevented from actively pursuing his business for life," authorizes the admission of evidence that the injury would be deleterious to the plaintiff's nervous, as well as to his general, system, and that it would diminish his strength and power of physical endurance.

INTERROGATORIES TO JURY.—*Antagonistic.—General Verdict.*—Where answers to interrogatories antagonize and destroy each other, the general verdict remains unimpaired and controls the judgment.

SUPREME COURT.—*Weight of Evidence.—Practice.*—Where there is evidence tending to sustain the verdict in all essential respects, it will not be disturbed on appeal, notwithstanding the fact that the weight of evidence seems to be overwhelmingly against it.

From the Whitley Circuit Court.

*C. B. Stuart* and *W. V. Stuart,* for appellant.

*L. M. Ninde, P. A. Randall* and *T. E. Ellison,* for appellee.

NIBLACK, J.—This action was commenced in the superior court of Allen county by Thomas S. Savage against the Wabash Railway Company, for damages for alleged personal injuries, where there was a trial and a verdict for the plaintiff. A new trial having been granted, a change of venue was ordered to the Whitley Circuit Court, where a second trial resulted in a verdict for the plaintiff, assessing his damages at $2,981.76.

This verdict was accompanied by answers to special interrogatories which had been submitted to the jury, upon which the defendant demanded judgment in its favor. But this demand, as well as a subsequent motion for a new trial, being refused, judgment was entered upon the verdict.

Error is assigned upon the alleged insufficiency of the complaint; upon the refusal of the court to require the complaint

to be made more certain and specific; upon the failure of the court to render judgment in favor of the defendant upon the answers to the special interrogatories, and upon the denial of the defendant's motion for a new trial.

The body of the complaint was as follows:

" Thomas S. Savage complains of the Wabash Railway Company, a corporation duly organized in pursuance of the laws of the State of Indiana, that said defendant, to wit, on the 15th day of October, 1878, owned and operated a railroad running through said county, and said defendant, on the day last aforesaid, was the owner and operator of the locomotives and cars used upon said railroad, and was then and there engaged in the business of a common carrier of passengers on its said road, and as such admitted the plaintiff into a car and train upon said road as a passenger thereon; that said car and train upon which the plaintiff was so admitted was to and did go from the city of Fort Wayne, in said county, westward, and the defendant, having so admitted the plaintiff on its said car and train, proceeded to carry him westward to a point, to wit, ten miles westward of said city of Fort Wayne, in a swamp, away from any station, where in the night time, when it was dark, the defendant failed to stop its said train so he could with safety alight from said car; but wrongfully, and without any fault on his part, while the train was running, said defendant, by its servants and agents, unlawfully struck him, the plaintiff, and wantonly, forcibly, wilfully and maliciously pushed, pulled, and shoved the plaintiff out of said car onto the platform thereof, and said defendant, by its said agents and servants, then unlawfully, wantonly, forcibly and wilfully struck said plaintiff, and shoved him with great violence from and off the said platform of said car, thereby threw and caused him to be thrown against and upon the ground with great violence, whereby, without fault or negligence on his part, he was made to fall upon and strike the earth with great violence, and was thereby thrown against and under the said car, and under the wheel of said car,

whereby his left arm and hand were greatly injured and crushed, so that it was and became necessary to amputate the same, and whereby his head and back and shoulder became and were greatly injured, and whereby he was confined to his bed for a long space of time, to wit, for the space of six months; and by reason thereof the plaintiff became and was for a long time sick and unable to walk or work; that he suffered therefrom great mental and physical pain, and was wholly unable to attend to his necessary and usual business, and has so continued to the present time, and has been put to great expense, to wit, five hundred dollars, for surgical and other treatment and attendance in attempting to cure himself of said injuries; that he was compelled to have his left arm amputated, and has thereby become wholly crippled and maimed, and prevented from actively pursuing his business, for life. Wherefore he sues and asks judgment for the sum of ten thousand dollars, and other relief."

It is first argued that the complaint was fatally defective for failing to aver that the agents and servants of the railway company were acting within the line of their duty when they committed the grievances complained of, and the case of *Helfrich* v. *Williams*, 84 Ind. 553, is cited as sustaining that construction of the complaint.

The general principle announced by that case, that the master is not liable for every act of negligence of his servant, but only for such acts of negligence as are committed while in his service, and in some way connected with such service, is, and long has been, a well established legal proposition, but we do not regard the principle thus announced as decisive of the insufficiency of the complaint in this case, which in effect averred that it was the *defendant, acting through its agents and servants*, which had injured the plaintiff. That was equivalent to an averment that the injury was inflicted by the defendant, *acting through its duly authorized agents and servants*. That made it at the trial a question of evidence as to whether the persons who performed the acts charged to

have been injurious to the plaintiff were the agents and servants of the defendant, and acting at the time within the lines of their respective duties.

This was a substantial compliance with the rules of good pleading, and with the precedents in similar cases.

At the proper time the railway company moved the court for an order requiring the plaintiff to make his complaint more certain and specific in the following respects :

1st. To set out the kind of a train he took passage on, whether freight or passenger.

2d. To state what servant or servants of defendant pushed plaintiff off of the car, whether conductor, brakeman, engineer, superintendent, or who it was.

3d. To state what time of day or night the train left Fort Wayne.

That motion was overruled, and that ruling is sharply criticised in argument here.

It must be borne in mind that the complaint in this case was not for an injury resulting from some general and unspecified negligence of the railway company, but was for a specifically described injurious act, wilfully and maliciously performed by the railway company, acting through its agents and servants.

This was sufficiently specific for all practical purposes, and consequently the court below did not err in overruling the motion to have the complaint made more specific. The cases of *Jeffersonville, etc., R. R. Co.* v. *Dunlap*, 29 Ind. 426, *Cincinnati, etc., R. R. Co.* v. *Chester*, 57 Ind. 297, *Hawley* v. *Williams*, 90 Ind. 160, and *Pennsylvania Co.* v. *Dean*, 92 Ind. 459, cited by counsel, are based upon facts essentially different from those charged in the complaint in the present case.

In answer to the first interrogatory addressed to them, the jury stated in substance, that the plaintiff was injured, on the 15th day of October, 1878, by being pushed or shoved from train No. 3 of the defendant's road, leaving Fort Wayne

about 9 o'clock P. M. on that day for the west, and that the plaintiff was so pushed or shoved from the train by a brakeman running upon it.

In response to the fourth interrogatory, the jury answered that the name of the brakeman who pushed or shoved the plaintiff from the train was Charles Allen.

To the sixth interrogatory, the jury answered, in effect, that Allen, as brakeman, had no power or authority from the railway company to eject a passenger.

To the seventh interrogatory, the jury returned for answer that Allen had orders, as well as power and authority, to eject the plaintiff.

As we construe the answers to the sixth and seventh interrogatories respectively, we do not consider them as seriously in conflict with each other.

In answering the sixth, the jury, we think, evidently meant to be understood as saying that in his capacity as brakeman merely, Allen had no power or authority to eject a passenger. As to the seventh, the meaning of the answer plainly was, that, in the particular instance referred to, Allen had orders from the conductor, and hence power and authority from him, to eject the plaintiff.

As thus construed, there was no real conflict between these answers. But, conceding them to have been irreconcilably conflicting, that circumstance afforded no cause for rendering a judgment in disregard of the general verdict.

When answers to interrogatories antagonize and practically destroy each other, the general verdict remains unimpaired and controls the judgment. *Baltimore, etc., R. R. Co.* v. *Rowan,* 104 Ind. 88.

Twenty causes were assigned for a new trial, but only three or four of these causes have been relied on in argument.

Our attention has been principally directed to the claim that the verdict was not sustained by sufficient evidence, and, in that connection, it is most earnestly contended that, con-

ceding the truth of all the matters testified to by the plaintiff, there was nothing showing, or fairly tending to show, that he was put off the train, as charged, by any one having authority from the railway company to control or eject passengers on its trains.

The plaintiff, who was the only witness in his behalf as to the manner in which his alleged injury occurred, stated that, on the 15th day of October, 1878, he resided at Garrett City, in this State, something more than twenty miles from Fort Wayne; that on the morning of that day he came down to Fort Wayne in a wagon with other persons; that in the afternoon, being disappointed in his expectation of returning by the same conveyance, he attempted to get back to Garrett City by railroad by way of Defiance, in the State of Ohio. After accounting for the manner in which he spent the day at Fort Wayne, he proceeded: "I heard the clock strike, and I counted seven, and I walked up Calhoun street to the depot, on the far side of the tracks; a man at the crossing told me which was the Defiance depot. I bought a ticket for Defiance, and then got a lunch, and then went out and got on the train on the south side; I did not know which way the train was headed; did not know the directions; heard there was a train going to Defiance, and knew that was east. I got on the train and stood on the platform until we were out of the city, at least the lamps were passed. I was looking at the city. The Wabash road crosses the Baltimore and Ohio at Defiance, and in that way I could get to Garrett, and if the train got there in time I would have probably reached home about 12 or 12 : 30 o'clock. After passing out of the city on the train, I went into the car and met a man whom I supposed to be the conductor, and he said: 'Where are you going, Cap.,' and I pulled out my ticket, and he said: 'You are on the wrong car; we are going west; get out at the first stop.' I told him all right, and then there was another fellow came along with a lamp, and he went into the car ahead of me. I stood there, and after awhile the fellow

came back with the lamp and said : ' I thought you were told to get off.' "

Question by plaintiff's attorney. " Who was it ? " Ans. " I took him to be a brakeman. The train did not stop at the crossing; did not stop at all while I was on the train ; I did not notice any crossing."

Question. " What else took place; you say this brakeman came back and said something ? " Ans. " Yes, sir."

Question. " What did he say to you ?" Ans. " He told me, ' I thought you were told to get off,' and I said I would when they stopped ; he said I must get off now, and I told him I would when they stopped the train. The man reached up and caught the bell-cord with his hand, and pulled it. He had a lantern and a cap—a dark looking cap ; have not paid attention to caps worn by brakemen on that road ; I have seen brakemen's caps."

Question by plaintiff's attorney. " How did this cap look as compared with the caps you have seen ? " Ans. " Well, I thought it was one; did not see anything on the cap ; the lantern looked like a railroad lantern ; it had a round globe with wires around it ; did not see any lettering on it. This was the same man that I saw with the conductor; both went in the car and this one came back. I did not hear anything said between this man and the conductor. I did not pay any attention where they went to until he came back. I was still on the platform holding on to the rail with my right hand. I had gone in the car, and when I found I was on the wrong train, I went out again. The train slacked up a little when he pulled the cord. I was on the third car from the engine. When the train slowed up he told me to get off, and I told him I would get off when he stopped the train, and not a damned minute before."

Question. " What did he say to that? Was it this same man that pulled the cord that you thought was a brakeman ? " Ans. " Yes, sir ; it was the same man ; he jumped right across on the platform where I was ; I was on one platform and he

on the other, and then he came across; he said any old woman could get off there; he then gave me a little push on the shoulder, and I lost my balance and I fell, and my head struck the journal or something; my left hand struck the wheel, and there were two wheels passed over my left hand, and I was to my feet before the other car passed.   When I got to my feet I looked back and said 'You son-of-a-bitch, you have killed me.'   I suppose it was the journal hit my head, but don't know.   The push he gave me was just a little push; I was standing on the lower step; I had hold of the rail with my left hand, ready to get off, on right side of car going forward; I was not holding on to any thing with my left hand; he pushed my left shoulder; I got up and walked down the track, until I came to a pile of ties, where I sat down; walked back the way I came.   I took hold of my hand with my other hand, and that stopped the blood; the blood was thick and my hand was fast there; I held it that way until I was picked up the next morning; I don't know how long I sat there on the ties; but when I got to my mind again I got up and stood on the track, and saw a light in the sky, and thinking that was Fort Wayne, I started that way."

The plaintiff further stated on his cross-examination : " He (the brakeman) was on the platform of the car when we were talking.   I don't know whether he jumped across, and I don't know whether I so testified on the other trial or at the preliminary examination.   I say now he came across, whether he jumped or stepped, and put his hand on my shoulder and gave me a little push—not very hard—and I lost my balance and fell backward.   My head struck something, and then I struck the ground."

Further on he said : " I testified on the other trial that he (the brakeman) swung me around and I fell.   I could not describe it very well further than that."

Dr. J. M. Young, a physician and surgeon, who was called to attend the plaintiff, on the morning of the 16th day of October, 1878, testified as to the latter's condition after his

arrival at Fort Wayne that morning; also to the amputation of the plaintiff's left hand at the wrist joint, as well as to the nature and extent of the injury which had made amputation necessary. In this latter respect Dr. Young was, in a general way, corroborated by other witnesses.

For the defendant E. F. Carver testified that he was, and for many years had been, a conductor on the Wabash Railway between Toledo, Ohio, and Danville, Illinois, by way of Fort Wayne; that on the morning of the 15th day of October, 1878, he left Toledo as conductor on what was known as train No. 1, a passenger and mail train, for the west; that he arrived with his train at Fort Wayne at about 3:50 o'clock that afternoon; that twenty minutes later, which was about 4:10 P. M., he proceeded on his way west; that going through his train after leaving Fort Wayne, he found the plaintiff in a seat in one of the cars, drunk and asleep; that on awakening the plaintiff and seeing his ticket, he told him he was on the wrong train, and that he must get off at the next stop, which would be at the Muncie crossing, a mile and a half or two miles west of Fort Wayne; that when the train stopped at the crossing the plaintiff got off, but that after the train left the crossing he, witness, found the plaintiff again on board; that when the train reached Aboite, which was the next regular station, and is perhaps twelve or thirteen miles from Fort Wayne, he, witness, again told the plaintiff that he must get off, as he was going the wrong way; that the plaintiff consented, and got off without being in any way injured.

In the respects stated, Carver was fully corroborated by one Clark, an employee of the railway company, who claimed to have been a passenger on the same train, and in the same car, with the plaintiff; also by one Myers, who was a brakeman on the same train, and who stated that he was instructed by Carver when the plaintiff got off at Aboite to see that he did not get on the train again before it left that station, and

that, in consequence, he observed the plaintiff very closely at the time.

Several other persons testified to having seen the plaintiff the same evening at, or in the vicinity of, Aboite after the train had passed, two or three claiming to have last seen him walking on or near the railway track, in the direction of Fort Wayne.

Edward H. Severance was also called as a witness for the defendant, and he stated that he was the conductor in charge of the train which left Fort Wayne for the west about 9 o'clock on the night of the 15th day of October, 1878, and from which the plaintiff claimed to have been ejected and injured. He further stated that there was no one on the train that night west of Fort Wayne who had a ticket for Defiance, or who was going the wrong way; that there was no one on the train that night who said he wanted to go to Garrett City; that there was no such person as the plaintiff on the train, and no such occurrences as those testified to by the plaintiff.

Charles Allen and Clarence Berry, who were with Severance as brakemen on the train, and were also witnesses, concurred with him in denying the statements of the plaintiff, as to the manner in which he was injured that night, and that there was any such man as the plaintiff on that train.

The plaintiff was, in brief, seemingly overwhelmed as to the time and manner in which he received the injury for which he sued.

Accepting the evidence introduced on behalf of the defendant as true, the inference is irresistible that the plaintiff was injured in some unexplained way after he left Aboite, and during the night, on his return to Fort Wayne. But notwithstanding the apparently overwhelming weight of the evidence on the side of the defendant, and consequent apprehension that great injustice may have been unwittingly done by the refusal of the circuit court to grant a new trial, the

fact still remains that there was evidence tending to sustain the verdict in all essential respects.

While it was well established at the trial, and may be safely accepted as a correct general rule, that a brakeman, in the absence of express orders, has no authority to eject a passenger from a train, it is nevertheless true that a railway company is liable for an injury wantonly inflicted by a brakeman on a passenger travelling on a train on which he is acting as brakeman. *Terre Haute, etc., R. R. Co.* v. *Jackson,* 81 Ind. 19 ; *Springer Transportation Co.* v. *Smith,* 16 Lea (Tenn.) 498.

This liability is based upon the doctrine that a passenger, while travelling on a train, is under the care and control of the railway company, and is hence entitled to be protected against the wilful misconduct of the company's agents and servants in charge of the train, and to whose authority he is required for the time being to yield a greater or less obedience.

The account which the plaintiff gave of the manner in which he was ejected from the train, in the event that the jury believed it, as they must have done, justified them in inferring that it was a brakeman who ejected him, and that the resulting injury was wantonly inflicted.

But hypothetically conceding that there was evidence tending to sustain the verdict, it is argued with much zeal and ingenuity, that the testimony of the plaintiff was so completely broken down by countervailing evidence introduced by the defendant, that this case ought to form an exception to the general rule that this court will not disturb a verdict upon the mere weight of the evidence, and the case of *Toledo, etc., R. W. Co.* v. *Goddard,* 25 Ind. 185, is cited as a precedent for such an exception.

The evidence before us presents a case which puts the rule, that we will not weigh the evidence when it is conflicting, to a severe test, but it must be borne in mind that the plaintiff testified fully and unequivocally to all the facts necessary to sustain the allegations of his complaint, and that the verdict in this case was the second verdict for the plaintiff on what

we must assume to have been substantially the same evidence. There must, therefore, have been something in the presence, the manner and the character of the plaintiff, unseen and unfelt by us, which greatly impressed both juries, and which peculiarly tended to carry conviction to their minds of the truth of his testimony.

After the most careful consideration, we would not feel justified in holding that the circuit court absolutely erred in denying the motion for a new trial for the alleged insufficiency of the evidence to support the verdict.

After Dr. Young had as a witness explained the nature of the injury which the plaintiff had received, and the remedy resorted to for his relief, he was, over the objection of the defendant, permitted to say that the effect of the injury would be very deleterious to the plaintiff's nervous, as well as to his general system, and that the injury would thereafter have an injurious effect upon his strength and power of physical endurance. It is insisted that there was nothing in any of the averments of the complaint, which justified the admission of such evidence, and that for that reason its admission was erroneous.

As will be seen by a recurrence to the complaint, it concluded with the averment, that the plaintiff had " thereby become wholly crippled and maimed, and prevented from actively pursuing his business, for life." Under our decided cases, that averment was quite sufficient to let in the evidence complained of. *Ohio, etc., R. W. Co.* v. *Selby,* 47 Ind. 471 (17 Am. R. 719) ; *Carthage T. P. Co.* v. *Andrews,* 102 Ind. 138 (52 Am. R. 653) ; *Louisville, etc., R. W. Co.* v. *Falvey,* 104 Ind. 409.

The judgment is affirmed, with costs.

ZOLLARS, J., having been of counsel in the court below, did not participate in the decision of this cause.

Filed Oct. 29, 1886; petition for a rehearing overruled May 17, 1887.